IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFFREY E. PERELMAN | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| RAYMOND G. PERELMAN, | : | |
| JASON GUZEK, and GENERAL | : | |
| REFRACTORIES COMPANY | : | NO. 10-5622 |

**MEMORANDUM**

**PADOVA, J.**                                              **February 18, 2014**

Presently before the Court is a Motion by Defendants General Refractories Company ("GRC"), Raymond Perelman ("Raymond"), Jason Guzek ("Guzek"), and Reliance Trust Company ("Reliance") for summary judgment on the remaining claims brought by Plaintiff Jeffrey Perelman ("Jeffrey"). (Docket No. 140). The Court heard oral argument on those motions on December 11, 2013. Thereafter, Jeffrey filed a Motion for Leave to Supplement his Second Amended Complaint. (Docket No. 156.) For the following reasons, we deny Jeffrey's Motion to Supplement, and grant summary judgment to Defendants on all of Jeffrey's remaining claims for equitable relief.[1]

## I.    PROCEDURAL HISTORY AND JEFFREY'S MOTION FOR LEAVE

In his Second Amended Complaint ("SAC"), Jeffrey, a participant in the General Refractories Company Pension Plan for Salaried Employees ("the Plan"), sought various forms of monetary and equitable relief from Raymond, Guzek, GRC, and Ronald Perelman ("Ronald"), including disgorgement of improper profits and the restoration thereof to the Plan; the removal of

---

[1] Also pending is Defendants' Motion in limine to preclude the testimony of Jeffrey's expert witness, Ricardo J. Zayas. (Docket No. 142.) Because the entry of summary judgment resolves all of Jeffrey's remaining claims, we do not reach the Motion in limine.

Raymond and Guzek as fiduciaries of the Plan, and an order enjoining them from serving in a fiduciary capacity with regard to any employee benefit plan subject to ERISA for the rest of their lives; the appointment of an independent trustee; an order directing the independent trustee to hire an independent auditor to conduct an audit of the Plan for the Plan Years 2002-2010; and an order declaring the indemnification provisions of the Plan document and trust agreement null and void as against public policy. <u>Perelman v. Perelman</u>, Civ. A. No. 10-5622, 2012 WL 3704783, at *3 (E.D. Pa. Aug. 28, 2012) ("the <u>SAC Opinion</u>").   In the SAC Opinion, we held that Jeffrey lacked standing in his capacity as a Plan participant to bring claims for monetary forms of equitable relief under ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), because he had not plausibly alleged actual harm, namely that the Plan would suffer a diminution in the value of Plan assets, diminution in the benefits he would receive from the Plan, or any risk that the Plan would default on its future obligations to participants, as a result of the Plan's allegedly improper investments. <u>Id.</u>, at *6 ("While an action for disgorgement of improper profits is an equitable remedy . . . under the holding in <u>Cigna Corp. [v. Amara</u>, ___ U.S. ___, 131 S. Ct. 1866, 1878 (2011)], to seek such relief actual harm must be demonstrated.  [B]ecause he has failed to allege any actual injury, we dismiss his claims seeking restoration of losses and disgorgement of profits as part of an equitable remedy.") (internal citations and footnote omitted).

Thereafter, GRC filed a Motion for Judgment on the Pleadings (Docket No. 106), Raymond and Guzek jointly filed a similar Motion (Docket No. 107), and Jeffrey filed a Motion for Leave to File a Third Amended Complaint ("the TAC") (Docket No. 109).  In his Motion for Leave to file the TAC, Jeffrey sought to rejoin Ronald (who has been dismissed as a defendant in the SAC Opinion) and, for the first time, add additional claims seeking monetary relief against all parties pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).  We held that Jeffrey, in his

capacity as a plan participant, did not have standing under ERISA section 502(a)(2) to seek monetary relief in the forms of disgorgement and restitution, and dismissed in their entirety the claims against Ronald which sought only money damages.  Perelman v. Perelman, 919 F. Supp. 2d 512, 520 (E.D. Pa. 2013) (the "TAC Opinion").  We found that the claims seeking equitable relief in the form of the removal of Raymond and Guzek, as trustee and administrator respectively of the Plan, and the appointment of an independent trustee were moot because Raymond and Guzek had already resigned, and Reliance had been appointed as the Plan's new trustee.  Id. at 522.  We held that Jeffrey's claim seeking a declaration that the Plan's indemnification clause is void failed to state a claim upon which relief could be granted because that document's clause fell within the safe harbor provided by 29 C.F.R. § 2509.75-4.  Id. at 523. However, we found that the Plan's Trust Agreement in effect during the time period at issue in the Second Amended Complaint did not fall within the safe harbor, and permitted that claim to continue.  Id. at 523-24.  Jeffrey's claim for injunctive relief seeking to bar Raymond and Guzek from serving in the future as ERISA fiduciaries was subject to dismissal on prudential standing grounds because Jeffrey did not show that he was asserting his own legal interests.  Id. at 525. Finally, we found that Jeffrey had no standing to seek an extensive audit of the Plan's past financial condition; rather, his right to injunctive relief as a plan participant was limited to an audit to determine the Plan's current ability to meet its financial obligations.  Id. at 526. Accordingly, we denied Jeffrey leave to file the TAC, but permitted him to add Reliance as a party defendant, since Reliance would be the party against which audit relief would be directed if that claim were successful.  Id. at 527.  Jeffrey did not seek reconsideration of any determination contained in the TAC Opinion.

In his current Motion, Jeffrey again seeks to supplement the SAC to add a claim for "surcharge," a monetary form of injunction relief, under ERISA section 502(a)(3). This claim for money damages under section 502(a)(3) is materially identical to the claim we dismissed in the <u>SAC Opinion</u>. Jeffrey argues that the record developed in discovery raises genuine issues of material fact, namely, whether the Defendants' actions caused losses to the Plan and whether the Plan is adequately funded. We deny the request to supplement the SAC.

Although Jeffrey's Motion is labeled as one to "supplement" the SAC, the relief its seeks — that he be permitted to assert a claim for an equitable form of money damages under section 502(a)(3) — has already been fully adjudicated in the SAC Opinion. Thus, the Motion must be deemed a motion under Fed. R. Civ. P. 60 for relief from our prior Order.[2] Rule 60(b) sets forth six grounds for relief, and seeks "to strike a proper balance between the conflicting principles that litigation must be brought to an end and that justice must be done." <u>Boughner v. Sec'y of Health, Educ. & Welfare</u>, 572 F.2d 976, 977 (3d Cir. 1978) (citation omitted). In addition to specific grounds for relief, the Rule provides a catchall of "any other reason that justifies relief."[3]

---

[2] We note that relief in the form of a motion pursuant to Rule 59(e) is not available since any motion pursuant to that Rule must be filed within 28 days after the entry of the judgment. Fed. R. Civ. P. 59(e). In his Motion for Leave, filed after oral argument, Jeffrey does not address the requirements for reconsideration of a prior decision under Rule 59(e), even though the Court admonished that any further consideration of a claim for monetary relief in contravention of our prior determinations would have to meet those requirements. (<u>See</u> N.T. 12/11/13 at 42:19-24; 46:8-12 ("We've got two hurdles. We've got whether or not this is an application for a reconsideration, which is a hurdle. . . . Whether this in fact is reconsideration. And if it is, is it timely? And if it's timely, was there a clear error of law? You know the hurdles, I don't have to tell you.").)

[3] Rule 60(b)(1) provides for relief upon the showing of "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1). Jeffrey does not specifically assert a claim of mistake, inadvertence, surprise or excusable neglect. Rule 60(b)(2) further provides for relief based on "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2). Although at oral argument Jeffrey alluded to evidence discovered after our SAC Opinion and

Fed. R. Civ. P. 60(b)(6).   A party seeking relief under Rule 60(b)(6) "must demonstrate the existence of extraordinary circumstances that justify reopening the judgment."   Budget Blinds, Inc. v. White, 536 F.3d 244, 255 (3d Cir. 2008) (footnote and citations omitted); Jackson v. Danberg, 656 F.3d 157, 165-66 (3d Cir. 2011) (relief under Rule 60(b)(6) is "available where the party seeking relief demonstrates that 'extreme' and 'unexpected' hardship will result absent such relief.") (quoting United States v. Swift & Co., 286 U.S. 106, 119 (1932)).

Jeffrey has identified no "extraordinary circumstances," which would cause "extreme and unexpected" hardship, and would thus warrant relief from the holdings we made in the SAC Opinion and TAC Opinion.  Jackson, 656 F.3d at 165-66 (quotation omitted).  In his proposed supplement, filed after the oral argument, Jeffrey again asserts that he "brings this action in his capacity as a participant and on behalf of [the Plan]"   (*See* Proposed Supplemented Second Amended Compl. ("PSSAC") at ¶ 1.)  He includes only one additional factual allegation, that "[a]s a result of Defendants' breaches of fiduciary duty, the Plan suffered a diminution in the value of its assets of at least $875,000," and is thus underfunded.  (PSSAC ¶¶ 231, 243, 251, 289, 316.)  Based on this allegation, he seeks to amend his prayer for relief to again include a request for monetary form of equitable relief, namely "imposing a surcharge on the Defendants requiring them to make the Plan whole for the diminution in the value of Plan assets caused by their breaches of fiduciary duties."  (PSSAC at 52.)  Notably, Jeffrey again does not allege that he, as a Plan participant, has suffered any actual harm as a result of the Defendants' allegedly improper

---

TAC Opinion were issued, (see N.T. 12/11/13 at 15:12-16:2 ("to the extent that [the Court] concluded previously in [the SAC Opinion] that there was insufficient allegations of loss, given where we are now in the case, the discovery that's taken place and the like, we think that fairness in equity suggests that the appropriate remedy here is to reinstate that part of the complaint and allow the case to proceed to trial")), Rule 60(b)(2) is not directly applicable since its scope of relief is limited to the results of a trial.  Thus, we consider Jeffrey's new factual allegations under the catchall provision of Rule 60(b)(6).

investments of Plan assets, such as a diminution in the benefits he would receive from the Plan, or that there is any risk that the Plan will default on its future obligations to participants.

The failure to allege individual loss renders implausible any assertion under Rule 60(b)(6) of extraordinary circumstances that would cause extreme and unexpected hardship, just as it again renders implausible the underlying claim for monetary forms of injunctive relief under section 502(a)(3) that the PSSAC seeks to add.  We have discussed extensively, in regard to both the section 502(a)(2) claim and the section 502(a)(3) claim, that Jeffrey's failure to allege individual harm resulting from the Defendants' alleged actions leads to the inexorable conclusion that he has no Article III standing to raise such claims.  <u>SAC Opinion</u>, 2012 WL 3704783, at *6; <u>TAC Opinion</u>, 919 F. Supp. 2d at 519-520.  Those claims, we stated, can only be raised, if at all, by the Plan itself, or by the Plan sponsor.  <u>TAC Opinion</u> at 520.  Even assuming that the value of Plan assets was diminished as a result of Defendants' alleged actions, and that the Plan was not made whole as a result of Raymond's voluntary payment (detailed below), Jeffrey still has not alleged that the ERISA benefits that he or any other Plan participant will receive has been negatively impacted.

The decisions upon which Jeffrey relies in seeking leave do not support his assertion of individual injury because they are clearly distinguishable on their facts.  In <u>Edmonson v. Lincoln Nat. Life Ins. Co.</u>, 725 F.3d 406, 416 (3d Cir. 2013), the Third Circuit reiterated its decision in <u>Horvath v. Keystone Health Plan E., Inc.</u>, 333 F.3d 450 (3d Cir. 2003), that section 502(a)(3) requires a plaintiff to show individual financial loss in order to have standing to pursue monetary relief.  *Id.* (stating "we believe <u>Horvath</u> holds that a plaintiff must show she has an individual right to the defendant's profit and that when a plan has the right to the profit, the individual plaintiff has not suffered a constitutional injury.")  Edmonson was the beneficiary of a life

insurance policy; rather than sending her full payment of the policy proceeds, Lincoln placed the proceeds in a checking account paying minimal interest, which Edmonson could draw upon as she wished, while it invested the retained assets for its own profit.   Id. at 411-12. Notwithstanding evidence that Lincoln advised Edmonson that she could withdraw the entire amount immediately, the Third Circuit held that she had demonstrated a genuine issue of material fact on the question of whether she suffered an individual injury because she had adduced evidence that the profit Lincoln earned from investing the retained assets was greater than the amount of interest it paid to her, thereby breaching its fiduciary duty.   Id. at 417 (holding that "Edmonson incurred an injury-in-fact because she 'suffered an individual loss, measured as the "spread" or difference' between the profit Lincoln earned by investing the retained assets and the interest it paid to her.").   The Court emphasized that an injury-in-fact sufficient to confer standing requires that the individual plaintiff have a "right to the profit."   Id. at 418.[4]

Jeffrey has made no such allegation here.   He does not assert an individual right to share in the alleged loss that the Plan suffered.   This failure amply demonstrates the absence of any extreme and unexpected hardship to Jeffrey arising from our prior decisions and the implausibility of the alleged supplement.   Accordingly, his Motion for Leave to Supplement is denied.

---

[4]   Jeffrey also relies on Amara v. CIGNA Corp., 925 F. Supp. 2d 242 (D. Conn. 2012), the opinion issued by the United States District Court for the District of Connecticut following remand by the Supreme Court of Cigna Corp.   There too, the Court determined that the plaintiffs had demonstrated an actual injury.   Id. at 259 (finding that "Plaintiffs have also demonstrated that a 'related loss' occurred, because, inter alia, Plaintiffs' retirement benefits were diminished . . . .")   Thus, it too is distinguishable from the allegations in the PSSAC.

## II.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment[5] on Jeffrey's two remaining claims for equitable relief and have filed a Statement of Undisputed Facts.  (See Docket No. 141.)  Jeffrey has filed a Response to Defendants' Statement.  (See Docket No. 147.)  The following facts are undisputed on the summary judgment record:

1.      The Plan is a defined benefit pension plan.  (Def. Ex. B at 1.)

2.      In March 2012, Raymond submitted an application to the Department of Labor for relief under its Voluntary Fiduciary Correction Program ("VFCP").  (Def. Ex. C.)

3.      As part of the VFCP application, Raymond contributed $270,446.42 to the Plan's trust ("VFCP Payment").  (Id.)

4.      In December 2012, the Department of Labor rejected Raymond's VFCP application because the transactions identified in that application did not meet the requirements of the VFCP.  The Department of Labor took "no position on whether the transactions" were prohibited by ERISA.  (Def. Ex. D.)

---

[5]  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.  In ruling on a summary judgment motion, we "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 276 (3d Cir. 2001) (internal quotation omitted).  If a reasonable fact finder could find in the nonmovant's favor, summary judgment may not be granted. Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 130 (3d Cir. 2002).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

5.      In September 2012, the Plan appointed a directed trustee, Reliance Trust Company, to hold the Plan's assets; an investment manager, InR Advisory Services, LLC ("InR"), to select the assets held by the directed trustee; and a custodian, and TD Ameritrade, to act as the Plan's broker/dealer and pay benefits to the Plan's participants and beneficiaries.  (Def. Ex. G.)

6.      On September 18, 2012, Raymond resigned as the Plan's trustee and GRC appointed Reliance to serve as the Plan's directed trustee.  (Def. Ex. E.)

7.      As part of this appointment, GRC and Reliance entered into a written agreement entitled "the Trust Agreement."  (Def. Ex. F.)

8.      Under the Trust Agreement, Reliance holds legal title to all of the Plan's assets. (Def. Ex. F, Arts. 1.8, III, V.)

9.      The Trust Agreement also provides that the Plan may appoint investment managers.  (Id., Art. 4.2.)

10.     With respect to assets that have been delegated to an investment manager, "the Trustee shall follow and carry out the instruction of the appointed Investment Manager with respect to the acquisition, disposition and reinvestment of assets[.]"  (Id., Art. 4.2(c).)

11.     The Trust Agreement also provides that Reliance is "subject to the direction of the Company, the Administrator and the Investment Committee, and, to the extent applicable under the terms of this Agreement, the directions of Investment Managers" in the "management and control of the Trust Fund[.]"  (Id., Art. 2.3(a).)

12.     The indemnification provision of the Trust Agreement provides:

> In the event that the Trustee incurs any liabilities, losses, or
> expenses (including without limitation attorneys' fees and court
> costs) (collectively referred to as "Losses") in connection with or
> arising out of its provision of services under this Agreement or its

> status as Trustee hereunder, then **the Company** shall indemnify and hold the Trustee harmless from and against such Losses, except to the extent such Losses arise directly from a failure by the Trustee to discharge its responsibilities under the terms of this Agreement in accordance with the standards under ERISA that are applicable to the Trustee.  The Trustee shall hold the Company harmless against any Losses as a result of a failure by the Trustee to discharge its responsibilities under this Agreement in accordance with the standards under ERISA that are applicable to the Trustee. The indemnification provided by this Section shall survive the termination of this Agreement.

(Id., Art. 10.9 (emphasis added).)

13.     The Trust Agreement defines the term "Company" as "General Refractories Company and its successors that adopt the Plan."  (Id., Art. 1.6.)

14.     On September 18, 2012, GRC entered into a written agreement, entitled Investment Advisory Agreement, with InR.  (Def. Ex. G.)

15.     Pursuant to the Investment Advisory Agreement, the Plan appointed InR "as an investment manager[,] under Section 3(38) of ERISA, responsible for the investment and reinvestment of the PLAN's assets."  (Id., ¶ 1(a).)

16.     In appointing InR as its investment manager, GRC intended InR to "provide [GRC] relief from the obligation to invest or otherwise manage PLAN assets managed by" InR. (Id., ¶ 23.)

17.     Pursuant to the Investment Advisory Agreement, GRC has delegated to InR "all of its powers with regard to the investment and reinvestment of" the Plan's assets and appointed InR as its "attorney and agent in fact with full authority to buy, sell, or otherwise effect investment transactions involving the" Plan's assets in its name.  (Id., ¶ 1(b).)

18.     The Investment Advisory Agreement also provides that InR "is authorized without prior consultation with [GRC], to buy, sell, trade and allocate in and among stocks,

bonds, mutual funds, sub-advisers, independent investment managers and/or programs (with or without discretion, depending upon the independent investment manager or program) and other securities and/or contracts relating to the same . . . and to give instructions in furtherance of such authority to the registered broker-dealer and the custodian" of Plan assets. (Id., ¶ 1(c).)

19.   Pursuant to this arrangement, Defendants assert that GRC and its shareholders and agents, including Raymond, currently have no control over the management of Plan assets and payment of benefits to its participants and beneficiaries. Jeffrey denies this allegation in his Response, but concedes that the Trustee "shall be subject to the direction of the Company, the Administrator and the Investment Committee, and, to the extent applicable under the terms of [the trust agreement], the directions of Investment Managers." (See Def. Ex. F, Art. 2.3(a).)

20.   On June 13, 2013, Guzek resigned from GRC. (Def. Ex. H.)

21.   According to Reliance's account statement, on December 31, 2012, the Plan's assets were $13,629,158.21. (Def. Ex. I.)

22.   The Plan's actuary, Boetger & Associates, Inc. ("Boetger"), prepared an actuarial report as of January 1, 2013 (the "2013 Actuarial Report"). (Def. Ex. J.)

23.   According to the 2013 Actuarial Report, the market value of the Plan's assets as of January 1, 2013 was $13,628,525. (Def. Ex. J, § 2.)

24.   As a defined benefit pension plan, the Plan's liabilities are a stream of future payments over the length of the lives of its participants and beneficiaries. (See Def. Ex. B, Art. I, § S.)

25.   In 2012, Congress passed, and the President signed, the Moving Ahead for Progress in the 21st Century Act ("MAP-21"), Pub. L. No. 112-141, *codified at* 26 U.S.C. § 430 (hereinafter "Internal Revenue Code" or "IRC"), and 29 U.S.C. § 1083.

26.     The Plan has elected to calculate its required minimum contributions by using MAP-21 Rates.  (Def. Ex. J at 2, 20.)

27.     Using IRS-mandated mortality tables and MAP-21 Rates, the Plan's Actuary calculated the Plan's liabilities as $13,025,137 as of January 1, 2013.  (Id. at 7.)

28.     The market value of Plan assets available to pay benefits, $13,628,525, exceeds the value of Plan liabilities, $13,025,137, calculated using MAP-21 rates.  (Id.)

29.     In support of their Motion, Defendants have submitted the August 9, 2013 expert report of Kenneth P. Shapiro, F.S.A.  (Def. Ex. N.)  He opines that, "using the actuarial assumptions mandated by the MAP-21, Plan liabilities were $13,025,137 and Plan assets were $13,343,937, resulting in a January 1, 2013 funding ratio on the MAP-21-Basis of 102.44%. Therefore, the Plan has sufficient assets to pay its funding obligations on an ongoing basis and no contributions are required to the Plan for 2013."  (Id. at 12.)

30.     In response to the Defendants' Motion, Jeffrey has submitted the July 26, 2013 expert report of Ethan E. Kra, Ph.D.  (Pl. Ex. B.)  He opines that, as of January 1, 2013, the Plan had accrued liabilities of approximately $16 million and assets of approximately $13.6 million, and was thus about 85% funded.  On a plan termination basis, the cost of settling the plan would likely have been between $17.5 million and $19 million.  Thus, on a plan termination basis, as of January 1, 2013, the plan was likely between 70% and 80% funded.  (Id. at 4.)

31.     Kra calculated the Plan's on-going and termination liabilities without using the MAP-21 provisions.  (Id. at 8; Pl. Ex. C, Deposition of Ethan E. Kra of 11/19/13, at 14-15.)  He opined that the MAP-21 "measure is not based on current economic reality, but rather is based on a measure utilizing discount rates derived from averaging interest rates over the past 27 years."  (Pl. Ex. B at 5.)  He opines that MAP-21 "imposes an artificial floor on 2013 discount

rates, thereby understating a plan's true liabilities." (<u>Id.</u> at 7.)  Its use "has the result of reducing

reported liability amounts, thereby making plans appear to be in a better financial position than

they otherwise would have reported and avoiding the imposition of certain benefit restrictions."

(<u>Id.</u>)   Congress, he asserts, enacted MAP-21 at the urging of significant lobbying by both

industry and organized labor constituencies, to enable plan sponsors "to defer otherwise

currently required contributions; thereby effectively 'kicking the can down the road' . . . ."  (<u>Id.</u>

at 9-10.)   He states that, although Congress enacted MAP-21, the Financial Accounting

Standards Board has refused to accept its methodology.  (<u>Id.</u> at 13.)

      32.     Kra concedes that MAP-21 adjustments

> are permitted for purposes of determining contribution requirements and benefit
> restrictions under IRC § 436. . . .  However, because these measurements are
> based on historical interest rates, they do not represent current economic reality. .
> . . These measures were developed based on a desire to derive a balance between
> up to date economic measures and the wish of plan sponsors for predictability and
> smoothing of liability amounts and contribution requirements. . . .  [MAP-21 and
> other alternate valuation provisions] were enacted to permit employers to
> contribute less on a current basis to defined benefit pension plans and to defer
> contributions to future time periods.  These laws had the effect of lowering
> immediate corporate tax deductions for pension contributions, increasing
> expected short term tax revenue and allowing Congress to utilize that expected
> incremental tax revenue for other economic stimulus purposes (e.g., building
> highways).  They were not designed to represent the true economic measures of
> pension plans.

(<u>Id.</u> at 19-20.)

      33.     At his deposition, Kra again conceded that, if one's purpose was to determine

whether GRC as plan sponsor was required to make additional contributions, under the MAP-21

provisions, which GRC elected to use, the Plan would be deemed fully funded.  (Pl. Ex. C at 18.)

He also conceded that if a plan sponsor has made the election under the Internal Revenue Code

("IRC") to use MAP-21, then the MAP-21 formula is mandatory.  (<u>Id.</u> at 21-22.)  He conceded

that, given GRC's election, the Plan's auditor, Boetger & Associates, properly used MAP-21 to

determine whether the plan was adequately funded, and that GRC did not need to make any additional contributions for 2013.  (Id. at 24.)

34.    Kra conceded that in choosing the interest rates he did in reaching his $16 million determination of the Plan's liabilities, he "was not making [his] determination under a law or regulation; [he] was making [his] determination under market conditions to determine whether or not the Plan had adequate funds to meet its obligations.  It was not a measure for a particular compliance with a particular law or regulation, but a measure of economic reality."  (Id. at 26.) In his opinion, the fiduciary breached no duty in not making additional contributions for 2013. (Id. at 50.)

35.    Jeffrey has also submitted the June 3, 2013 expert report of Ricardo J. Zayas, CPA.  Zayas opines that, with a reasonable degree of accounting certainty, the payment made by Defendants due to their actions disclosed in the VFCP, $270,446, underestimated the loss to the Plan and did not fully compensate the Plan for the alleged shortfall.  He calculates that the Plan suffered the following net loss due to the Defendants' prohibited investments of Plan assets in Revlon:

| | | |
|---|---|---|
| Revlon Notes Shortfall | $ | (875,881) |
| MacAndrews Term Loan Shortfall | | (759,394) |
| Raymond's VFCP payment | | 270,446 |
| Net Plan Shortfall | | (1,364,828) |

(Def. Ex. M at 2.)

A.    The Audit Claim

Defendants argue they are entitled to summary judgment on Jeffrey's audit claim because there is no genuine dispute that Congress permitted plan sponsors such as GRC to use MAP-21

rates to determine how much such sponsors must contribute to a plan, and, under that method, the Plan is properly funded according to law.  They argue that Jeffrey has failed to meet his summary judgment burden to demonstrate that genuine issues of material fact exist on his audit claim because his only evidence, the Kra report, is not evidence that the Plan is underfunded using the method permitted by Congress.  Rather, they assert that Jeffrey has only shown that this expert  disagrees with the policy enacted by Congress permitting the MAP-21 averaging as actuarially permissible.  Because the Plan is adequately funded according to law, they conclude that Jeffrey cannot prevail on his equitable claim to an audit.

Jeffrey responds that in the TAC Opinion we determined that he could pursue the equitable claim of an audit "limited to a determination of whether the Plan is currently underfunded," which we defined as "a determination of the Plan's current ability to meet i[t]s financial obligations."  (Pl. Br. at 5-6 (quoting TAC Opinion, 919 F. Supp. 2d at 526).)  He contends that the Plan is currently underfunded and is not currently able to meet its financial obligations because, even with Raymond's $270,446.42 VFCP payment, the Plan still suffered a shortfall of $1,364,828 traceable to Defendants' improper conduct.  He argues that Defendant's reliance on MAP-21 funding requirements, i.e., whether GRC is required to make additional contributions for 2013, is a "straw man" argument since MAP-21 is a "theoretical accounting question based on an artificial political construct." (Pl. Br. at 6.)  He argues that, even though Congress allowed plan sponsors to use the new rules, IRC § 430(h)(1)(A) and (B) still require that actuarial assumptions and methods be "reasonable (taking into account the experience of the plan and reasonable expectations) and . . . offer the actuary's best estimate of anticipated experience under the plan."  (Pl. Br. at 7 (quoting IRC § 430(h)(1)(A), (B)).)  He asserts that this requirement "counsels squarely against using MAP-21 rates as a method for determining whether

a fiduciaries' [sic] *admitted* misconduct has left a Plan unable to meet its financial obligations."
(Pl. Br. at 7-8 (emphases in original).)   Jeffrey contends that if we were to allow Defendants to
use the MAP-21 rules, it would allow a fiduciary to "legally commit a breach of fiduciary duty
without consequence."   (Id. at 9.)   He argues that MAP-21 was never meant to define or limit a
fiduciary's liability for a breach.    Because Dr. Kra's evidence shows that the Plan was
underfunded, Jeffrey asserts that he has met his burden to demonstrate that a genuine issue of
fact remains to be tried.

### 1.    The MAP-21 Regulations

Under the IRC and ERISA, GRC is liable for making minimum required contributions to
the Plan.  See IRC § 430, 26 U.S.C. § 430; 29 U.S.C. § 1083.  The IRC and ERISA set forth the
method for determining the amount, if any, of the minimum required contributions a plan
sponsor such as GRC must make to an ERISA plan.  Id.  When a plan's assets exceed the present
value of its liabilities, the plan sponsor does not have to contribute any additional assets to the
Plan.  See IRC § 430(a); 29 U.S.C. § 1083(a).

If a plan sponsor elects to use MAP-21 rules, those rules set forth the method for
calculating a plan's assets for the purposes of determining the amount of required minimum
contributions, if any.   See IRC § 430(g)(3)(A); 29 U.S.C. § 1083(g)(3)(A).   Under MAP-21, a
plan sponsor may use "the fair market value of" the Plan's assets for the purposes of determining
the amount of required minimum contributions, if any.  Id.  Actuarial assumptions and methods
are used to calculate the present value of a plan's liabilities for the purposes of determining
minimum required contributions.   See IRC § 430(h); 29 U.S.C. § 1083(h).   Actuarial
assumptions must be "reasonable (taking into account the experience of the plan and reasonable
expectations)," and "which, in combination, offer the actuary's best estimate of anticipated

experience under the plan." IRC § 430(h)(1)(A), (B). MAP-21 rules also set forth demographic assumptions, which attempt to calculate the length of the lives of a plan's participants and beneficiaries, and economic assumptions, which attempt to calculate the time value of money owed to pay accrued benefits using an interest rate that approximates the return of assets held over the lives of the participants and beneficiaries. See IRC § 430(h)(2)-(3); 29 U.S.C. § 1083(h)(2)-(3). The IRC and ERISA require the Internal Revenue Service to promulgate by regulation the mortality tables used to calculate the demographic assumptions, and the Plan to use such mortality tables for the purposes of determining the amount of required minimum contributions. See IRC § 430(h)(3); 29 U.S.C. § 1083(h)(3). MAP-21 mandates the interest rates a plan must use for making economic assumptions for the purposes of determining the amount of required contributions, if any.[6] IRC § 430(h)(2)(B); 29 U.S.C. § 1098(h)(2)(B).

The IRS has published regulations in regard to the use of MAP-21. If the plan sponsor elects to use MAP-21 rates, the IRS has stated that these rates must be used for a number of purposes under IRC § 430, including the calculation of "target normal cost," "funding targets," the present value of remaining shortfall and waiver amortization installments, the amount of

---

[6] Under MAP-21, a plan must use interest rates based on corporate bond yields averaged over a certain period ("MAP-21 Rates"), unless the plan sponsor elects to use an interest rate based solely on a single month of market interest rates. IRC § 430(h)(2)(C)-(D); 29 U.S.C. § 1083(h)(2)(C)-(D). Prior to MAP-21, the Internal Revenue Service calculated the interest rate for determining liabilities of a defined benefit pension plan by averaging market interest rates of corporate bonds over a twenty-four month period. IRC § 430(h)(2)(D); 29 U.S.C. § 1083(h)(2)(D); Pub. L. 109-280. MAP-21 keeps the rolling twenty-four month average of interest rates as the default rate for defined benefit pension plans; however, under MAP-21, defined benefit pension plans must also take into account a 25-year rolling average of interest rates. IRC § 430(h)(2)(C)(iv)(I); 29 U.S.C. § 1083(h)(2)(C)(iv)(I).

Under MAP-21, the interest rates for a plan year are adjusted so that they are no less than a minimum percentage (floor) and no more than a maximum percentage (cap) of the average rates for a rolling 25-year period. IRC § 430(h)(2)(C)(iv)(II); 29 U.S.C. § 1083(h)(2)(C)(iv)(II). Instead of the averaging scheme described above, MAP-21 also allows the plan sponsor to elect to use an interest rate based solely on a single month of market interest rates. IRC § 430(h)(2)(D)(ii); 29 U.S.C. § 1083(h)(2)(D)(ii).

amortization installments with respect to a shortfall or waiver amortization base, and the limitation on the assumed rate of return when determining the average value of assets.  See IRS Notice 2012-61, Guidance on Pension Funding Stabilization under the Moving Ahead for Progress in the 21st Century Act (MAP-21), *available at* http://www.irs.gov/pub/irs-drop/n-12-61.pdf, at 1 ("IRS MAP-21 Guidance*")*.  The IRS has also specified that, once the plan sponsor elects to use MAP-21, "the MAP-21 segment rates apply to all measurements that are based on the segment rates described in § 430(h)(2)(C)(i), (ii) and (iii).  Accordingly, once the amendments made by MAP-21 are effective for a plan year . . . current liability is determined using the third segment interest rate under § 430(h)(2)(C)(iii) in lieu of the interest rate otherwise used.  For purposes of determining the minimum contribution requirements under § 412 (as in effect before PPA '06), current liability is determined reflecting the MAP-21 adjustments to the third segment rate in accordance with § 430(h)(2)(C)(iv)."  IRS MAP-21 Guidance at 5.[7]

2.      Because The Plan is Properly Funded Under MAP-21 Rules, Jeffrey Has No Right to Audit Relief

We find that Jeffrey has not met his summary judgment burden to demonstrate a genuine issue of material fact on the issue of whether he is entitled to the equitable relief of an audit.  Congress has permitted plan sponsors such as GRC to elect to use the MAP-21 method to determine whether plans are in compliance with the IRC and ERISA.  GRC has elected to use the

---

[7]  The IRS has also specified when MAP-21 segment rates should not be used.  *See* IRS MAP-21 Guidance at 9.  In addition, the IRS has stated that the "determination of whether a plan is in at-risk status for a given plan year (and the extent to which the § 430(i)(1)(C) load and § 430(i)(5) transition adjustment apply) is made separately for purposes for which the MAP-21 segment rates apply and for purposes for which the MAP-21 segment rates do not apply, based on the segment rates or rates from the full yield curve that were used to calculate the funding target for that specific purpose for the preceding plan year.  For example, a plan may be in at-risk status for a given plan year for purposes of determining the deductible limit under § 404(o), but not be in at-risk status for purposes of determining the minimum required contribution for that same plan year."  IRS MAP-21 Guidance at 10.

MAP-21 method, allowing it to meet the Plan's statutory funding requirements using the more lax funding formula. Having so elected, under IRS rules it *must* use the MAP-21 method to calculate the "target normal cost and funding target . . . ." IRS MAP-21 Guidance at 1. It is prohibited from using any other valuation method, since the IRS has ruled that "the MAP-21 segment rates apply to *all* measurements" under IRC § 412 and 430(h) — the minimum funding standards applicable to defined benefit plans.[8] Id. at 5. Jeffrey states no cogent basis to support his contention that GRC was required to fund the Plan in violation of MAP-21, so as to reimburse it for Defendants' alleged improper investment of Plan assets.

---

[8] As noted, Congress has mandated both a percentage funding floor and a percentage funding cap for the average rates for calculating the amount that electing plan sponsors must contribute. As Dr. Kra stated, the reason Congress mandated a maximum is that the pension contribution provision of MAP-21 was a revenue raising provision. (Pl. Ex. C at 19-20.) MAP-21 was primarily a highway infrastructure bill. It provided for increased transportation funding as part of the economic stimulus plan. The legislative history of MAP-21 shows that the pension provisions were enacted to pay for the infrastructure spending as well as provide pension funding relief to employers. The House Report states:

> The conference report that was enacted into law on July 6, 2012, as renamed the "Moving Ahead for Progress in the 21st Century Act" ("MAP–21"), reauthorized appropriations for Federal highway and other transportation programs–and extended the general expenditure authority of the HTF–through September 30, 2014. The conference report also extended the excise taxes that support the HTF through September 30, 2016, while making various other tax and tax-related policy changes. Among those other tax and tax-related provisions, the conference report: (1) changed the calculation of interest rates used to determine pension liabilities, thus effectively providing pension funding relief to employers sponsoring defined benefit pension plans. . . .

H.R. Rep. 112-750, 2013 WL 200671, at *10; see also Blackrock, Corporate Pension Funding Update, *available at* https://www.blackrock.com/institutions/en-us/literature/publication/blk-corporate-pension-funding-update.pdf ("This provision was considered a 'pay for' the Highway Bill as pension contributions lower the tax bill for corporations, and deferring these payments translates into paying higher taxes in the short term.") The cap on pension contributions effectively capped the corporate tax deduction allowed to plan sponsors for pension contributions, thereby raising revenue for the federal government.

We conclude that the issues of whether or not the Plan suffered a shortfall from the fiduciaries' actions, and whether or not the fiduciaries "escape" responsibility for reimbursing the Plan for that shortfall, are inapposite to whether the Plan is currently funded according to law, and by derivation, whether Jeffrey can demonstrate a triable issue on whether he has the right to an audit.  Where fiduciaries are sued by a Plan or a Plan sponsor, any loss suffered by the Plan arising from prohibited investments could be relevant to a claim for breach of fiduciary duty.  However, *as a plan participant*, Jeffrey has no standing to recoup plan assets absent a showing that the Plan is at risk of complete default and the plan sponsor is financially incapable of making up any losses suffered by the plan.  TAC Opinion, 919 F. Supp. 2d at 518 (stating that "[a]s a beneficiary to a defined benefit pension plan, [Jeffrey] cannot establish standing to sue on behalf of the Plan absent a plausible allegation that the breach of fiduciary duty created or enhanced a risk of default by the entire plan." (citing LaRue v. DeWolff, Boberg & Assocs., Inc., 552 U.S. 248, 255 (2008) (stating that "Misconduct by the administrators of a defined benefit plan will not affect an individual's entitlement to a defined benefit unless it creates or enhances the risk of default by the entire plan."))).)  Given his limited rights as a plan participant, we accordingly limited Jeffrey's claim to audit relief to a determination whether the Plan was currently funded to adequately meet is financial obligations.  Id. at 526.  Because there is no genuine dispute that the Plan meets its current obligations under congressionally mandated funding rules, Jeffrey's assertions that the Plan suffered a shortfall and that the fiduciaries will "escape" responsibility for reimbursing the Plan, fail to create factual issues sufficient to establish the existence of an element essential to his audit claim.

Accordingly, summary judgment is entered in favor of Defendants and against Jeffrey on the audit claim.  Since Jeffrey is not entitled to audit relief, any claim against Reliance is moot.

We ordered that Reliance be added as a defendant in the *TAC Opinion* because, as the Trustee, it would be the party against whom the audit relief would be directed. *Id.*, 919 F. Supp. 2d at 521 n.1. Since there is no viable claim for an audit, there is no longer any viable claim against the Trustee.

### B.      The Indemnity Clause Claim

We also find that Defendants are entitled to summary judgment on Jeffrey's equitable claim for an order declaring the indemnification provision of the Plan's prior trust agreement null and void as against public policy. At the time of the Revlon transactions, the trust agreement then in effect provided that:

> In addition to any other limitation on liability set forth in the Agreement, the Trustee shall not be liable for any losses which may be incurred with respect to the Trust, except to the extent that such losses shall have been caused by its negligence, bad faith or willful misconduct, and the Trustee shall be fully protected for action taken or not taken pursuant to the provisions of this Agreement.

TAC Opinion, 919 F. Supp. 2d at 522 n.4. We held that this indemnification clause, unlike the indemnification clause contained in the Plan itself, did not qualify for the "safe harbor" contained in the Department of Labor's regulations governing ERISA indemnity clauses, *see* 29 U.S.C. § 1110(b), 29 C.F.R. § 2509.75-4, because it did not eliminate the possibility that fiduciaries could be indemnified with Plan assets. TAC Opinion at 523 ("While Raymond and Guzek argue that the Trust Agreement, like the Plan, indemnifies the trustee only with GRC's assets and not Plan assets, no such limitation is contained in the Trust Agreement."). Defendants assert that they are entitled to summary judgment because Jeffrey's claim regarding the prior Trust Agreement's indemnification clause is moot. They argue that (1) we have already held that Jeffrey is barred from recovering monetary forms of equitable relief, i.e., restitution or disgorgement, against the former fiduciaries; and (2) Jeffrey has failed to produce any evidence

that the Defendants obtained, or ever sought to obtain, indemnification with Plan assets.  We agree.

Because we have held that Jeffrey cannot recover monetary forms of equitable relief, it follows that the prior indemnification clause can never be exercised by Defendants to recoup any monetary recovery *by Jeffrey*.  Accordingly, his claim that the clause is void against public policy fails to state a justiciable "live" claim.  The United States Supreme Court has held that a plaintiff cannot demonstrate the continued existence of a "Case" or "Controversy" simply by showing that a justiciable dispute existed when his or her lawsuit was filed.  Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990); see also New Jersey Turnpike Auth. v. Jersey Cent. Power & Light, 772 F.2d 25, 31 (3d Cir. 1985) (stating that an actual controversy must exist at all stages of a litigation, not merely at the time that a plaintiff files the complaint).  When a claim becomes moot, a federal court is deprived of its power to act, since there is nothing left for the court to remedy.  Spencer v. Kemna, 523 U.S. 1, 18 (1998); Powell v. McCormack, 395 U.S. 486, 496 (1969) (holding that "a case is moot when the issues are no longer 'live' or the parties lack a legally cognizable interest in the outcome.").  Jeffrey lacks a cognizable interest in the outcome of whether the prior trust's indemnity clause is void because, this Court having held that he cannot recover monetary forms of equitable relief, Defendants will never have to look to Plan assets to indemnify them on Jeffrey's claims.  Should Defendants ever seek to invoke the prior indemnification clause to recoup damages recovered by someone else, it is the Plan itself that must assert that the clause is void against public policy — not Jeffrey as a participant in a plan that has the ability to meet its current obligations.[9]

---

[9]   We reject as meritless Jeffrey's assertion that a live controversy remains between himself and Raymond and Guzek, since he also seeks to hold them liable for his attorneys' fees and costs.  It is well-settled that an outstanding issue regarding attorney's fees and costs cannot

## III.   CONCLUSION

Jeffrey's Motion for Leave to Supplement is denied and Defendants' Motion for entry of summary judgment on Jeffrey's last two remaining claims for equitable relief is granted. Because the entry of summary judgment resolves all of Jeffrey's claims, there is no need to address the pending motion in limine to bar Jeffrey's expert evidence.  An appropriate order will be entered.[10]

---

breathe life into an otherwise moot complaint.  See Lewis v. Cont'l Bank Corp., 494 U.S. 472, 480 (1990) (declaring that an "interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim" and that "reasonable caution is needed to be sure that mooted litigation is not pressed forward, and unnecessary judicial pronouncements on even constitutional issues obtained, solely in order to obtain reimbursement of sunk costs."); Zacharkiw v. Prudential Ins. Co. of Am., Civ. A. No. 10-639, 2012 WL 39870, at *4 (E.D. Pa. Jan. 6, 2012) (collecting cases).

[10] Also pending is Defendants' Motion to Seal Raymond Perelman's Voluntary Fiduciary Correction Program Application (Document No. 151).  Pursuant to Rule 26(c), the Court may enter a protective order upon a showing of good cause "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c).  In Pansy v. Borough of Stroudsburg, 23 F.3d 772 (3d Cir. 1994), the Third Circuit identified the following factors in applying the good cause balancing test: (1) the interest in privacy of the party seeking protection; (2) whether the information is being sought for a legitimate purpose or an improper purpose; (3) the prevention of embarrassment, and whether that embarrassment would be particularly serious; (4) whether the information sought is important to public health and safety; (5) whether sharing of the information among litigants would promote fairness and efficiency; (6) whether the party benefitting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public.  Id. at 787-88; see also Miller v. Indiana Hosp., 16 F.3d 549, 551 (3d Cir. 1994) (stating that because there is a common law right of access to judicial records in an "ordinary civil litigation," a party seeking to seal a portion of the judicial record bears the burden of demonstrating that "disclosure will work a clearly defined and serious injury to the party seeking disclosure.").
  Defendants argue that Raymond has a compelling interest to seal the Application because it contains sensitive financial information regarding Raymond and the Plan.  The Application contains details of the allegedly improper Plan investments in Revlon securities.  Given that the substance of the document Defendants seek to seal was widely discussed in the Defendants' own public submissions to this Court, (see, e.g., Def. Br. at 5; Def. Ex. K); the Plan sent a notice to all persons with an interest in the Plan stating that Raymond made a filing and payment under the VFCP, see Docket No. 151-1 at 2; and the document involves the filings of an ERISA fiduciary regulated by the Department of Labor and is thus important to the public, on balance we conclude that there has been an insufficient showing of good cause to grant the requested relief.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.

---

In so stating, however, we note that we have not determined, nor have we been asked to determine, whether any additional disclosure of the Application by a party would be prohibited by their own confidentiality agreement.